[No. G026984. Fourth Dist., Div. Three. Apr. 26, 2001.]

VALLELY INVESTMENTS, L.P., Plaintiff and Appellant, v. BANCAMERICA COMMERCIAL CORPORATION, Defendant and Respondent.

818

## COUNSEL

Law Office of Harry S. Carmack, Harry S. Carmack; Greines, Martin, Stein & Richland, Robin Meadow and Laura Boudreau for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Alan H. Martin, Aaron J. Malo and Karin Dougan Vogel for Defendant and Respondent.

## OPINION

**BEDSWORTH, J.**—This case presents the question of whether a tenant who takes an assignment of a mortgaged ground lease, expressly assuming its obligations, remains liable to the lessor after foreclosure of the mortgage. Vallely Investments, L.P. (Vallely), the lessor, sued for a declaration that BancAmerica Commercial Corporation (BACC), the assignee, was bound by the lease. Vallely argues the trial court erred in granting summary judgment in favor of BACC, and it should have granted Vallely's own motion for summary judgment. We agree, and reverse with directions that judgment be entered in favor of Vallely.

The material facts are not in dispute. Vallely owns a parcel of property in Newport Beach. In 1978, Vallely entered into a long-term ground lease with a developer. Following a series of assignments, the lease ended up in the hands of Balboa Landing, L.P. (Balboa). In 1986, Vallely and Balboa amended and restated the lease, providing, among other things, that its term would expire in 2051.

The lease permitted the lessee to transfer or assign its interest freely, or to encumber it with a mortgage. Any assignment had to be in writing, with

notice to the lessor. The assignee was required to expressly accept and assume all of the terms and covenants of the lease, and any leasehold mortgage was subordinate to the lessor's rights. Article 13(e) stated no leasehold mortgagee or foreclosure sale purchaser would incur any liability for rent, or performance of leasehold covenants, unless it became owner of the leasehold by foreclosure or assignment in lieu of foreclosure. Then its liability was limited to that arising by operation of law or privity of estate.

In 1986, Balboa borrowed $7 million from BA Mortgage and International Realty Corp. (BA Mortgage) to develop the property. It secured the loan with a deed of trust on the ground lease. Balboa defaulted in 1988, and BA Mortgage commenced foreclosure. In 1989, Balboa filed for bankruptcy protection to stay the foreclosure.[1]

The default presented risks for both Balboa and BA Mortgage. Balboa wanted to avoid personal liability for its partners, while the lender wanted to ensure the property was maintained (which Balboa was financially unable to do) and also sought a procedure that would wipe out junior mechanics' liens. A deed in lieu of foreclosure offered by Balboa (to preclude personal liability) was turned down, out of concern that merger of title in the lender would propel the mechanic's liens into a senior position.

The solution arrived at was an assignment of the lease to BACC, a wholly owned Bank of America subsidiary which would manage the property pending a nonjudicial foreclosure. Foreclosure would wipe out the junior liens and conducting it nonjudicially precluded a deficiency judgment. A stipulation to this effect was entered into in the bankruptcy proceeding.

In April 1989, Balboa and BACC executed an instrument entitled assignment of leasehold interest. In it, BACC "accepts the within assignment and, in addition, does hereby covenant and agree to and with [Balboa] to faithfully observe, perform and fulfill all of the terms, covenants and conditions and obligations required to be observed, performed and fulfilled by [Balboa] as lessee under the Ground Lease . . . ." The assignment was recorded. It was never revealed to Vallely, which first learned of it several years later in connection with events that precipitated this lawsuit.

BA Mortgage was the successful bidder at the foreclosure sale held about two months later. As lessee, it managed the property until selling the lease to Edgewater Place, Inc. (Edgewater) in July 1994.

---

[1]BA Mortgage later changed its name to Real Estate Collateral Management Company. In the interest of simplicity, we continue to refer to it as BA Mortgage.

In November 1994, Vallely gave Edgewater an extension of time to pay the 1996 rent, which was due in one lump sum in November 1995. In return for Edgewater's promise to make certain repairs by the end of July 1995, Vallely agreed to allow it to pay the 1996 rent in equal monthly installments. This was reflected in a lease amendment signed by the parties, which provided that all other rent obligations under the lease remained unchanged.

Edgewater failed to pay the rent due for May 1996, and Vallely sued. Only then did Vallely learn of the 1989 assignment to BACC. In March 1997, Edgewater filed a chapter 11 bankruptcy petition. It failed to assume or reject the lease, with the result that in June 1998, the bankruptcy court entered an order deeming the lease rejected. Vallely retook possession of the property in August 1998.

Meanwhile, in April 1998, Vallely commenced the instant action against BACC. It sought a declaratory judgment that BACC was liable, as assignee, for the rent due for the balance of the lease term. Both sides moved for summary judgment. Vallely's position was that BACC's express assumption of the lease obligations bound it as a matter of contract law, and that the obligation survived the later foreclosure. In the course of opposing Vallely's motion and presenting its own,[2] BACC raised numerous theories under which it escaped liability, all of which we will address in due course. At this point, suffice it to say the trial court denied Vallely's motion and granted summary judgment for BACC on the ground that BA Mortgage's foreclosure of its senior deed of trust terminated BACC's junior interest in the lease, and along with it any obligations that entity had to Vallely. Both rulings were mistaken. While BACC presents many able and inventive arguments to avoid liability, we conclude none carry the day.

I

We review the grant or denial of summary judgment de novo. (*Environmental Protection Information Center v. Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1011, 1015-1016 [50 Cal.Rptr.2d 892].) The judgment may be affirmed on any correct legal theory, provided the opposing party had the opportunity to address it below. (*Kramer v. State Farm Fire & Casualty Co.* (1999) 76 Cal.App.4th 332, 335-336 [90 Cal.Rptr.2d 301].)

---

[2]BACC made two summary judgment motions. The trial court initially granted BACC's first motion for summary judgment, reversed itself when Vallely moved for a new trial, but then granted BACC's second summary judgment motion.

## II

The first issue is the significance of BACC's assumption of the lease obligations. Under settled law, BACC was contractually liable to Vallely.

A lease of real property is both a conveyance of an estate in land (a leasehold) and a contract. It gives rise to two sets of rights and obligations— those arising by virtue of the transfer of an estate in land to the tenant (privity of estate), and those existing by virtue of the parties' express agreements in the lease (privity of contract). (See generally 6 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 18.17, p. 33.)

When a tenant assigns a leasehold, both aspects come into play in determining the obligations of the assignor and the assignee to the landlord. Looking first at the assignor, the transfer terminates his privity of estate with the landlord, but it does not affect privity of contract. The assignor remains liable to the landlord absent an express release. (*De Hart v. Allen* (1945) 26 Cal.2d 829, 832 [161 P.2d 453].)

An assignee's liability to the landlord turns on the nature of the assignment. If the assignee takes possession of the premises but no more, privity of estate exists and he is bound by all lease covenants which run with the land. Upon a subsequent assignment, privity of estate ends and, with it, all obligation to the landlord. (*Kelly v. Tri-Cities Broadcasting, Inc.* (1983) 147 Cal.App.3d 666, 678 [195 Cal.Rptr. 303].) If, however, the assignee expressly agrees with the assignor to assume the obligations of the lease, far different consequences attend. The assumption agreement creates a new privity of contract between landlord and assignee, enforceable by the landlord as a third party beneficiary, regardless of whether the landlord was a party to the assumption agreement. As a consequence, the assuming assignee is required to perform all covenants of the lease for the remainder of its term, absent a release by the landlord. (*Hartman Ranch Co. v. Associated Oil Co.* (1937) 10 Cal.2d 232, 244-245 [73 P.2d 1163]; Rest.2d Property, Landlord and Tenant, § 16.1 (4), com. c, p. 121.) Such is the case before us.

Balboa assigned the leasehold to BACC, and the latter expressly assumed the obligations of the lease, as required of any assignee pursuant to the terms of the lease. The document of conveyance, as noted above, is entitled "Assignment of Leasehold Interests." It states Balboa transferred to BACC "all of Assignor's right, title and interest as lessee in and to the Ground Lease . . . and all other right, title or interest held by Assignor in and to the Property . . . for and during the full respective unexpired terms of the Ground Lease." As the title indicated, this reflects an assignment, not a sublease.

BACC attempts to wiggle out of the assignment by suggesting it took a sublease, or alternatively, some other interest it calls a "temporally limited leasehold assignment" or "sub-set" of Balboa's rights. Both points are honed too fine.

In contrast to an assignment, a sublease is a transfer of only a portion of the tenant's estate, with the latter retaining a reversionary interest. (*Kendall v. Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 492, fn. 2 [220 Cal.Rptr. 818, 709 P.2d 837].) Presumably, BACC would like to be characterized as a subtenant to come within the rule that a subtenant is not directly liable to the landlord, there being neither privity of estate nor contract (the sublease creates a new estate, and is a contract between the tenant and subtenant). (*Hartman Ranch Co. v. Associated Oil Co., supra*, 10 Cal.2d at p. 242; cf. *Marchese v. Standard Realty & Dev. Co.* (1977) 74 Cal.App.3d 142, 147 [141 Cal.Rptr. 370].) But saying it does not make it so.

The gist of BACC's argument is that it received less than Balboa's entire leasehold estate. But the facts do not bear out this assertion. First, BACC points out the assignment recited it was subject to the deed of trust. It contends this shows its interest was subject to termination by foreclosure, so it was less than the entire estate held by Balboa. A nice try, but bootless. BACC got the entire lease, and the fact that BACC could lose it by foreclosure does not diminish the estate. Second, BACC argues it only intended to hold the leasehold estate for the short time required for the mortgagee to foreclose, so the interest was less than an assignment. The flaw here is the operative instrument, in both name and fact, passed the entire leasehold interest to BACC. We just cannot see it as anything but an assignment.

But even if we did view this as a sublease, the outcome would be the same. A subtenant who expressly assumes the obligations of the prime lease, with the consent of the landlord, comes into privity of contract with the landlord, and the latter can enforce the assumption agreement as a third party beneficiary. (*Hartman Ranch Co. v. Associated Oil Co., supra*, 10 Cal.2d at pp. 244-245; *Marchese v. Standard Realty & Dev. Co., supra*, 74 Cal.App.3d at p. 147.) So while we view this as an assignment, BACC would not escape liability even as a sublessee. We turn then to the impact of foreclosure on BACC.

## III

Whether foreclosure of a leasehold mortgage extinguishes the duties owed to the lessor by an assignee who assumes the lease is a question

not previously addressed by any California case that has been brought to our attention. Consideration of the operation and purposes of foreclosure leads us to conclude such an assignee's contractual obligations to the lessor survive foreclosure.

■ A valid foreclosure terminates all interests in the real estate junior to the mortgage being foreclosed (see, e.g., *Sumitomo Bank v. Davis* (1992) 4 Cal.App.4th 1306, 1314 [6 Cal.Rptr.2d 381]), but it does not terminate interests senior to the mortgage. (See, e.g., *R-Ranch Markets #2, Inc. v. Old Stone Bank* (1993) 16 Cal.App.4th 1323, 1327 [21 Cal.Rptr.2d 21] [senior lease not extinguished by foreclosure of junior deed of trust]; Rest.3d Property, Mortgages, § 7.1.) This is consonant with the purpose of foreclosure, which is to allow the mortgagee to sell the collateral taken for the loan, that is, the same title the mortgagor had when the mortgage was executed. (See, e.g., *Sumitomo Bank v. Davis, supra,* 4 Cal.App.4th at p. 1306 [judicial foreclosure]; *Dover Mobile Estates v. Fiber Form Products, Inc.* (1990) 220 Cal.App.3d 1494, 1498 [270 Cal.Rptr. 183] [nonjudicial foreclosure].)

■ In this case, Vallely's interest as lessor (technically a reversion) was senior to the leasehold mortgage. While foreclosure extinguished BACC's junior assignment, it could not have any impact on Vallely's senior reversion. Vallely's right to enforce BACC's assumption agreement, as a third party beneficiary, was an incident of the reversion. As such, it could not be wiped out by the junior foreclosure. Thus, the foreclosure terminated the privity of estate and privity of contract between BACC and *Balboa,* but it did not reach the privity of contract between BACC and *Vallely.* This gives full weight to the mortgagee's right to realize upon its collateral, and equal obeisance to the rule that foreclosure does not terminate senior interests.

Our conclusion finds support in cases enforcing a tenant's attornment agreement following foreclosure of a mortgage senior to the lease containing the attornment clause.[3] These cases, too, recognize that contract obligations survive foreclosure when they do not impair the foreclosing mortgagee's rights. (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman, supra,* 65 Cal.App.4th 1469; *Miscione v. Barton Development Co.* (1997) 52 Cal.App.4th 1320 [61 Cal.Rptr.2d 280].)

In *Principal,* a tenant entered into a lease that provided it was subordinate to all existing and future liens on the landlord's property. The tenant agreed

---

[3]We realize that only the most serious devotees of the esoterica of property law will read beyond the phrase "attornment clause." Most of them probably already know that "attornment" is an old word with a simple modern meaning: The tenant has agreed, or will agree, to recognize his landlord's successor in interest as his new landlord. (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1479 [77 Cal.Rptr.2d 479].)

to attorn to the landlord's successor in interest upon request, and be bound by a new lease on the same terms as the old one. (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman, supra,* 65 Cal.App.4th at p. 1475.) Following foreclosure of a senior mortgage, the tenant contended its lease was extinguished and ceased paying rent. The court held the lease was terminated by the foreclosure, but the landlord was nonetheless entitled to enforce the attornment agreement as a third party beneficiary. (*Id.* at pp. 1487-1488.) To coin a phrase we find irresistible, we agree with the *Principal* principle.[4]

BACC argues it escapes liability under *Dover Mobile Estates v. Fiber Form Products, Inc., supra,* 220 Cal.App.3d 1494, but we cannot agree. *Dover* considered the impact of foreclosure of a mortgage on a subordinate lease, and it held the lease was extinguished. A tenant entered into a five-year lease that provided it was subordinate to any deed of trust later placed on the property. The lessor subsequently encumbered the property, defaulted, and the lender foreclosed. When the foreclosure sale purchaser notified the tenant to pay rent to it, the tenant replied that its lease was extinguished and a month-to-month tenancy resulted. After business fell off, the tenant gave the landlord notice terminating the tenancy, and left. The landlord sued for rent due under the lease. The court held for the tenant, applying the rule that a lease junior to a deed of trust is extinguished by a foreclosure sale. (*Id.* at p. 1498.)

We agree with *Dover* as far as it goes, but it is distinguishable. There, the fee was mortgaged. Foreclosure wiped out the junior lease and, with it, the rights of both landlord and tenant under the lease. In the present case, only the leasehold was morgtaged. The landlord's reversion was unencumbered, and its rights could not be affected by the foreclosure. Also, we have here an assignee who assumed the lease obligations. Unlike *Dover,* we must consider the consequences of foreclosing a *leasehold mortgage* on an *assuming assignee's duties* to the unaffected *senior interest.* Thus *Dover,* while accurate on its facts, has no persuasive force here.

BACC argues *Dover* is controlling because the court stated "[a] foreclosure proceeding destroys . . . the lessee's rights *and obligations* under the

---

[4]We note courts in two other states recently recognized that contract rights which do not affect the foreclosing party's rights survive the foreclosure. *Strader v. Sunstates Corp.* (1998) 129 N.C.App. 562 [500 S.E.2d 752, 756-757]) held an action for damages for breach of express lease covenants survived foreclosure, reasoning that while property rights are cut off, those arising from contract are not. *P.S.G. Ltd. v. August Income/Growth Fund* (1993) 115 N.M. 579 [855 P.2d 1043, 1048] held a liquidated damages clause in a lease survived foreclosure, on the same theory.

lease. [Citation.]" (*Dover Mobile Estates v. Fiber Form Products, Inc., supra,* 220 Cal.App.3d at p. 1498, italics added.) It contends the junior lease there is no different than the junior assignment here. But there is a difference. Here, Vallely had an interest senior to the mortgage being foreclosed, and BACC had obligations to Vallely. *Those* obligations were not involved in *Dover.* On the facts of that case, the *Dover* statement was accurate, but those are not our facts.

Looking beyond *Dover,* BACC argues it was protected from postforeclosure liability by article 13(e) of the lease, and public policy dictates the same result. Neither point is persuasive.

Article 13(e) provided that neither a leasehold mortgagee or foreclosure sale purchaser "shall incur or be required to assume liability for the payment of rent . . . or for the performance of any of the Lessee's covenants or agreements . . . ." It also stated that if a leasehold mortgagee acquired the lease by foreclosure, its liability was limited to that arising by privity of estate. But this provision does not help BACC. It was neither the mortgagee nor the purchaser, and it voluntarily *chose* to expressly assume the obligation to pay rent.

BACC insists it was the agent of BA Mortgage, which *was* the mortgagee and purchaser. But nothing in the record supports this assertion. The agency argument relies solely on an internal memorandum sent to BACC by BA Mortgage following the foreclosure sale. The writing advised BACC the foreclosure was completed, thanked it for its assistance, and enclosed a check reimbursing BACC for expenses incurred. But, as Vallely points out, BACC accepted the assignment in its own right as "assignee," following which it notified tenants that "BankAmerica Commercial Corporation became the owner of Edgewater Place" and directed them to pay rent to its new managing agent.

BACC asserts the memorandum was "evidence" of an agency relationship. But we do not see it that way. Indeed, we cannot find anything in the document which would even raise a factual issue regarding agency.

Agency is either actual or ostensible. (Civ. Code, § 2298.) An actual agency exists when one person is employed to represent another (Civ. Code, § 2299), while an ostensible agency exists when the principal causes a third person to believe another, not employed by him, is his agent. (Civ. Code, § 2300.) ■ Indicia of an agency relationship are the agent's power to alter legal relations between the principal and others, a fiduciary relationship, and the principal's right to control the agent's conduct. (*Lewis v.*

*Superior Court* (1994) 30 Cal.App.4th 1850, 1868-1869 [37 Cal.Rptr.2d 63].) The memorandum contains nothing that would raise an inference BACC bore any of these badges of agency, and the assignment and notification to tenants bespeak a company acting for its own interests. The agency argument lacks factual support.

The policy argument is of a piece. BACC argues relieving it of liability would not deny Vallely the benefit of a bargain since Vallely gave no consideration for the assignment, was unaware of it, and waived any claim against a leasehold mortgagee in article 13(e). But BACC overlooks the fact Vallely *did* bargain for the right to hold assignees liable. Section 12.2 of the lease allowed assignment without the lessor's consent, but provided "the assignee shall expressly accept and assume all of the terms and covenants in this lease . . . ." The same section also required that notice of an assignment be given to the lessor. This BACC never did. It is hard to discern any policy that favors denying enforcement of an obligation on the ground that the party charged failed to reveal it to the one benefited. ■ The foreclosure, then, did not relieve BACC from the liability it agreed to when it assumed the lease.

## IV

BACC next contends suretyship law and bankruptcy law released it from liability. The suretyship argument is that BACC became a surety when Edgewater acquired the lease, and Vallely's agreement to defer payment of the 1996 rent was a modification that discharged it. The bankruptcy point is that Edgwater's rejection of the lease in bankruptcy extinguished the lease and all obligations under it. Neither is accurate.

## A

It is unclear whether California law accords the assignor of a leasehold the status—and defenses—of a surety.[5] But even if it does (a point we do not decide), BACC was not discharged by the lease modification.

---

[5]One can find general statements in the cases that an assignor of a leasehold becomes a surety for the obligations of his assignee (see, e.g., *Kendall v. Ernest Pestana, Inc., supra,* 40 Cal.3d at p. 500), a position supported by the Restatement. (Rest.3d Suretyship and Guaranty, § 1, com. b, p. 6, com. h, p. 10.) Other statements suggest there is no suretyship relationship. (See, e.g., *De Hart v. Allen, supra,* 26 Cal.2d 829, 832; *Meredith v. Dardarian* (1978) 83 Cal.App.3d 248 [147 Cal.Rptr. 761].) But none of the cases cited by the parties is dispositive.

Perhaps closest on point is *Meredith v. Dardarian, supra,* 83 Cal.App.3d 248, with dicta that an assignor *does not* become a surety for his assignee. Assignors of a lease were sued by the landlord for rent unpaid by their assignee. Among other defenses, the assignors claimed they were discharged by the landlord's extension of the assignee's time to pay rent. The court

A surety's defenses against a creditor do not arise until the creditor knows of the surety's existence. Once the creditor learns of the surety relationship, he must respect it in subsequent dealings with both principal and surety—but before that, he is not subject to the surety's defenses. (*Westinghouse Credit Corp. v. Wolfer* (1970) 10 Cal.App.3d 63, 68 [88 Cal.Rptr. 654]; Rest.3d Suretyship and Guaranty, § 32, subd. (3)(a).) As the Restatement explains: "It would be unfair to an obligee [the landlord] that had no notice of the secondary obligor's [BACC's] suretyship status if [his] actions resulted in defenses to the duty of the secondary obligor . . . ." (Rest.3d Suretyship and Guaranty, § 32, com. a, p. 137.)

Vallely was unaware BACC might be a surety when it agreed that Edgewater could pay the 1996 rent monthly. Thus, BACC cannot conjure up a defense from the Edgewater lease modification. BACC argues Vallely was on constructive notice because it recorded the assignment in 1989, but this fails to acknowledge the purpose and operation of the recording acts. Recording provides constructive notice of a transfer or encumbrance to *subsequent* purchasers or mortgagees. Vallely would have neither occasion nor reason to search title to its own lease, and it is not charged with constructive notice of an assignment recorded after its own interest was of record. (*R-Ranch Markets #2, Inc. v. Old Stone Bank, supra,* 16 Cal.App.4th at p. 1329, fn. 2.)

BACC took a chance in not notifying Vallely of its assignment, and it turned out to be a bad risk. It cannot now clothe itself in the defenses of a surety when it never showed those colors to Vallely until *after* Edgewater defaulted, when BACC first faced the possibility of liability. Accordingly, we do not reach the question whether the extension of time to pay the 1996 rent completely discharged BACC or, as contended by Vallely, whether the extension was a nonmaterial alteration that discharged BACC only to the extent of the loss it caused.

## B

BACC argues rejection of the lease in bankruptcy terminated it as to all parties under California law, and federal decisions in the Ninth Circuit are in accord. Other than the satisfaction of being right, however, BACC would gain nothing from this argument, because Vallely's contract rights against it do not depend upon the validity of the lease. And as a matter of bankruptcy

---

stated there was no evidence of the claimed extension, yet it went on to declare the assignors were not sureties and were not entitled to the surety's defense of exoneration. (*Id.* at pp. 252-253.)

law, BACC also loses: The California and federal cases are distinguishable; the evolving federal view is rejection of a lease in bankruptcy does not alter the contract rights of nondebtors; and Ninth Circuit case law does not compel a contrary result.

The California cases BACC relies upon are *366-388 Geary St., L.P. v. Superior Court* (1990) 219 Cal.App.3d 1186 [268 Cal.Rptr. 678], and *Ilkhchooyi v. Best* (1995) 37 Cal.App.4th 395 [45 Cal.Rptr.2d 766]. *Geary* held rejection of a tenant's lease in bankruptcy extinguished the security interest of a leasehold mortgagee, relying in part on two Hawaii bankruptcy court decisions. (*366-388 Geary St., L.P. v. Superior Court, supra,* 219 Cal.App.3d at pp. 1197-1198.) That has no bearing here; Vallely's contract rights do not depend upon the validity of the lease. *Ilkhchooyi* relied on *Geary* in holding rejection of a lease in bankruptcy terminated a sublease as well. (*Ilkhchooyi v. Best, supra,* 37 Cal.App.4th at p. 404.) Here again, the case is inapplicable, for Vallely is not claiming any rights under the lease that was rejected.

BACC's federal cases are equally distinguishable. They involve a bankrupt lessee who wanted to affirm his lease (*Sea Harvest Corp. v. Riviera Land Co.* (9th Cir. 1989) 868 F.2d 1077), a bankrupt lessee who wanted an extension of the time to either affirm or reject his lease (*In re Southwest Aircraft Services, Inc.* (Bankr. 9th Cir. 1986) 66 B.R. 121, revd. on other grounds (9th Cir. 1987) 831 F.2d 848), and a creditor holding a security interest in a bankrupt's interest as lessee under a lease. (*In re Gillis* (Bankr. D. Hawaii 1988) 92 B.R. 461; *In re Hawaii Dimensions, Inc.* (Bankr. D. Hawaii 1984) 39 B.R. 606; *In re Bernard* (Bankr. D. Hawaii 1986) 69 B.R. 13.) That a lessee's interest is extinguished by rejection is not at issue here. Nor, as we said above, is the issue what happens to a creditor's security interest in a lease that is rejected.

The view of rejection expressed in these bankruptcy cases is also changing. ▉ The emerging rule is "the effect of rejection of an executory contract or unexpired lease is limited to a breach or abandonment by the debtor or trustee rather than a complete termination of the lease. *Rejection should not operate to damage the rights of third parties with rights in the leasehold estate.*" (3 Collier on Bankruptcy (15th ed.) § 365.09[2], pp. 365-36 to 365-37, italics added, fns. omitted.) The most recent bankruptcy cases from courts in the Ninth Circuit that have been brought to our attention take this position. (*In re Bergt* (Bankr. D. Alaska 1999) 241 B.R. 17, 28; *In re Locke* (Bankr. C.D.Cal. 1996) 180 B.R. 245, 260.) Following a lengthy analysis of the cases, including those cited by BAAC, the bankruptcy judge in *Bergt* concluded: "There is nothing in the 9th Circuit case authority that

prevents this court from adopting the view that the nondebtor's rights . . . are not terminated even if . . . an executory contract [was] rejected by . . . the debtor." (*In re Bergt, supra,* 241 B.R. at p. 28.)[6]

Putting all this together, we conclude federal bankruptcy law does not compel the conclusion that rejection of the lease by Edgewater terminated Vallely's rights against BACC. That accords with our independent analysis, since those contract rights do not depend upon the validity of the ground lease.

Thus, we conclude BACC assumed the lease obligations, foreclosure did not extinguish its contractual duties to Vallely, and BACC was neither exonerated as a surety nor relieved of its liability by rejection of the lease in Edgewater's bankruptcy case. For these reasons, the trial judge erred in granting summary judgment in favor of BACC. Unless something more appears, Vallely was the party entitled to summary judgment, so we must now consider BACC's position that the trial court correctly denied Vallely's motion.

## V

BACC argues disputed fact questions preclude summary judgment for Vallely. It contends there was a fact dispute over whether it intended to be bound by the lease obligations following foreclosure, and a trial is also required to determine if there was a novation that released it from liability when BA Mortgage sold the lease to Edgewater. We think not. The disputed fact argument is a red herring. The company's intent is immaterial so, as a matter of law, it is no defense, and there is no evidence of a novation.

## A

BACC argues its intent to incur only limited liability is shown by the language of the assignment and the bankruptcy stipulation. To back this up, it also offered two declarations of its intent, one from a lawyer and another from a custodian of records who authenticated documents.[7] Vallely objected to the declarations, and this is where BACC sees a fact dispute. The trial court excluded the declarations as moot after it ruled the foreclosure extinguished BACC's obligations. Vallely now concedes "for purposes of this

---

[6]Executory contracts and unexpired leases are treated alike under the Bankruptcy Code provisions that give the trustee the choice to reject such interests. (11 U.S.C. § 365.)

[7]One of BACC's declarations was from David Granoff, an attorney who represented it during negotiations with Balboa leading up to the assignment. The other came from Eric Forsberg, who, as custodian of records, purported to authenticate the two documents BACC claims demonstrate its intent.

appeal" that BACC expected to possess the lease only through the foreclosure, while at the same time insisting the declarations were inadmissible. But even assuming the declarations were admissible (a point we do not decide), they are irrelevant.

In essence, BACC's argument is that the assignment was expressly stated to be "subject to" the deed of trust to make it subordinate to that lien, so the assignment would be wiped out by the pending foreclosure. This, we are told, shows BACC only planned to have possession of the property until foreclosure was completed. It also shows the company intended to be liable on the assumption agreement only during that short period. BACC claims the same intent was shown by a provision in the bankruptcy court stipulation approving the assignment, one that required BA Mortgage to "use its best efforts to complete a non-judicial foreclosure sale." It further asserts it could never have intended to assume the lease obligations because federal banking regulations prohibited it from retaining an interest in real property for more than five years without regulatory approval.[8]

█ Extrinsic evidence is irrelevant to prove the meaning of a document whose language is not reasonably susceptible of the interpretation urged. (*Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 16-17 [92 Cal.Rptr. 704, 480 P.2d 320].) Here, nothing in the assignment can be fairly read as limiting BACC's obligations to the time it possessed the property. That being so, extrinsic evidence of intent cannot be considered, whether from the declarations, the stipulation, or federal banking law. BACC assumed the lease obligations without qualification, and those contractual duties did not end with the foreclosure. It could have structured the transaction so that it shed *all* liability with the foreclosure, by taking the assignment *without* assuming the lease. But that is not what it did. Having decided there were good reasons to assume the lease, BACC cannot now avoid the consequences by arguing it never meant them.

### B

Nor is there anything to the novation argument. BACC claims BA Mortgage's transfer to Edgewater "may" have been a novation, citing *Wells Fargo Bank v. Bank of America* (1995) 32 Cal.App.4th 424 [38 Cal.Rptr.2d 521]. The misreading of *Wells Fargo* which underlies this argument indicates

---

[8]Vallely argues BACC misunderstood the applicable banking regulations, and moved us to take judicial notice of an Office of the Comptroller's interpretation found in Office of the Comptroller of the Currency, Interpretive Letter No. 491 (1989) Federal Banking Law Reporter (CCH) paragraph 83,074, page 71,184. Since we conclude BACC's intent was irrelevant, we have no need to examine federal law on this point. Nonetheless, the motion is granted.

a misunderstanding of the requirements for novation. A novation requires an express release by the party entitled to enforce a promise. In *Wells Fargo*, the lease provided that upon assignment, the tenant was relieved of all further liability to the landlord. (*Id.* at p. 432.) The lease in this case contains no such agreement by Vallely.

No fact dispute precludes summary judgment for Vallely. BACC's subjective intent in assuming the lease is immaterial, and there is no evidence of a novation. Since BACC assumed the lease, foreclosure did not extinguish its contractual obligations to Vallely. It cannot raise any suretyship defenses, and rejection of the lease in Edgewater's bankruptcy did not terminate BACC's duties. Accordingly, Vallely was entitled to summary judgment.

The judgment appealed from is reversed, and the trial court is directed to enter summary judgment for Vallely. Vallely is entitled to costs on appeal.

Sills, P. J., and Aronson, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied July 18, 2001. Chin, J., did not participate therein.

---

*Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.